ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| GENARO CAUTIÑO JORDÁN<br>Apelado<br><br>v.<br><br>HOTEL HORIZONTE, S.P. SOCIEDAD ESPECIAL<br>Apelante | KLAN202300496 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Patillas en Guayama<br><br>Caso Número: G3CI201800082<br><br><br>Sobre: Incumplimiento de contrato |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Rivera Marchand y la Jueza Aldebol Mora

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de febrero de 2024.

Comparece Hotel Horizonte, S.P., Sociedad Especial (HH o apelante) y nos solicita la revocación de la *Sentencia* emitida el 20 de abril de 2023, notificada el 9 de mayo de 2023 por el Tribunal de Primera Instancia, Sala de Patillas (TPI o foro primario), la cual fue enmendada *Nunc Pro Tunc* el 7 de noviembre de 2023. En esta, el foro primario declaró ha lugar la demanda de epígrafe y denegó la reconvención instada en contra de Genaro Cautiño Jordan (Cautiño o apelado).

Por los fundamentos que exponemos a continuación, confirmamos el dictamen apelado. Veamos.

**I.**

La presente causa versa sobre el alegado incumplimiento de pago, relacionado a un pagaré hipotecario suscrito por HH, a favor de Genaro Cautiño Jordan. Lo antes, como secuela de la otorgación de una Escritura de Compraventa, así como de una Escritura Hipotecaria suscritas por HH y Cautiño. El negocio jurídico entre las partes contempla la venta del 50% de una finca (propiedad de

Número Identificador

SEN2024_____

Cautiño y sita en Guayama) para el desarrollo de un proyecto de extracción de relleno en dicho predio.

Ante el presunto incumplimiento de HH, Cautiño incoó el pleito de epígrafe.[1] En esta expuso que, las partes suscribieron una Escritura de Compraventa, el 2 de abril de 2009, mediante la cual, el demandante le vendió al demandado 50% del referido predio. El mismo día, las partes otorgaron una Escritura de Hipoteca, con el fin de garantizar el pago diferido de $454,000.00 para la compra de la propiedad allí descrita. Como parte de sus alegaciones, informó que Benito Ramos Fernández (Ramos Fernández) es el socio gestor de HH y compareció en el pagaré hipotecario como el deudor solidario. Indicó que, en el pagaré hipotecario se pactó el 31 de marzo de 2014 como fecha de vencimiento y había transcurrido el término sin que la parte demandada haya acreditado el pago correspondiente. Sostuvo que, a pesar de los requerimientos de pago cursados, HH no acreditó cumplimiento de lo pactado. En su consecuencia, suplicó al TPI que declarara líquida y vencida la deuda y ordenara el pago de $454,000.00 del principal adeudado, $255,521.33 en intereses acumulados, más $15,000.00 por concepto de costas y honorarios de abogado. En su defecto, solicitó que autorizara la venta en pública subasta de la participación del 50% de la finca por las cantidades adeudadas.[2]

Por su parte, HH acreditó su contestación a la demanda, en la que negó las alegaciones e interpuso una reconvención, el 8 de febrero de 2019.[3] En apretada síntesis, HH negó haber incumplido

---

[1] El pleito inició en la Sala de Guayama bajo el número G AC2017-0091 contra HH, Benito Ramos Fernández t/c/p Benito R. Fernández, Fulana de tal y la sociedad legal de gananciales compuesta por ambos; y Fulano y Mengano de tal como demandados desconocidos. Luego en virtud de una *Orden de traslado* emitida el 3 de diciembre de 2018, fue trasladado a la Sala de Patillas con el número asignado G3CI20180082.

[2] Apéndice págs. 18-22. Superada la etapa inicial del litigio, el TPI atendió una solicitud de desestimación interpuesta por la parte demandada y mediante *Resolución*[2] emitida el 4 de diciembre de 2018, consignó varios hechos y ordenó la desestimación de la causa en contra de Ramos Fernández, su esposa y la sociedad legal de gananciales compuesta por ambos. En su consecuencia, continuaron los procesos contra HH.

[3] Apéndice, págs. 24-28.

lo pactado. Sostuvo que, la obligación de pago solicitada por Cautiño, está sujeta a una condición suspensiva cuyo cumplimiento era necesario para lograr el desarrollo del proyecto de extracción de relleno y Cautiño no cumplió. Expuso su postura sobre la creación y funcionamiento de otra corporación, Extracciones Sin Límite (ESL) y la falta de cumplimiento de Cautiño por no sufragar gastos relacionados a un permiso del Departamento de Recursos Naturales (DRNA) y por no entregar un plano de mensura, entre otros asuntos. Por ello, suplicó al TPI que ordenara la resolución del contrato y la devolución de los fondos que fueron adelantados para el proyecto, más el resarcimiento de los daños y perjuicios ante la presunta negligencia, inacción e incumplimiento de Cautiño. En reacción, el demandante acreditó su réplica a la reconvención el 28 de febrero de 2019 en la que negó las alegaciones del demandado.[4]

Luego de múltiples incidencias procesales que resultan innecesarios pormenorizar,[5] el demandante presentó una *Moción de sentencia sumaria y desestimación de reconvención* el 28 de mayo de 2019. Tras celebrar una vista argumentativa[6], el TPI emitió una *Resolución* el 9 de julio de 2019, (notificada en autos el 16 de julio de 2019), mediante la cual declaró no ha lugar el referido petitorio sumario. En este dictamen interlocutorio el foro primario destacó lo siguiente:

> [...]
> "En cuanto a la Solicitud de Sentencia Sumaria debido a que es un hecho incontrovertible la terminación del pagaré y la obligación del demandado al pago del mismo se declara No ha lugar.
> Este Tribunal ya atendió una Solicitud de Desestimación de la parte demandada en donde se plasmaron los hechos incontrovertibles y por qué razón aún no se puede ejecutar la demanda. En esta Resolución se determinó que el pagaré venció el 31 de marzo de 2014 y que los intereses del mismo comenzarían a cobrarse el próximo mes que se otorgue los permisos de extracción de relleno de esta propiedad. Además, se estableció que el permiso de extracción del Departamento de Recursos Naturales se otorgó el 12 de mayo de 2017, por lo que los intereses comenzarían a transcurrir desde el 1ro de junio de 2017. En la vista celebrada el 31 de enero de 2019, las partes estuvieron de acuerdo con que la

---

[4] Apéndice, págs. 29-32.
[5] La demanda fue enmendada el 5 de abril de 2019 y HH presentó una *Contestación a demanda enmendada.*
[6] Véase Minuta en Apéndice págs. 85-96 y Autos originales Tomo II, págs. 277-282.

> Resolución emitida por el Tribunal cubría gran parte de la Solicitud de Sentencia Sumaria de la parte demandante y aceptaron dar por atendida la Solicitud de Sentencia Sumaria. (Así se desprende de la Minuta del 31 de enero de 2019). En cuanto a la Solicitud de Desestimación de la Reconvención, [...] no ha lugar.
> [...][7]

De esta forma el foro primario dejó pendiente ante su consideración, varias controversias medulares sobre la naturaleza y validez de las obligaciones entre las partes y los supuestos incumplimientos que podrían fundamentar la resolución del contrato.[8] A pesar de que, no surge una lista fehaciente, colegimos del expediente que, tras disponer de los petitorios sumarios, el TPI dejó pendiente para dirimir, con el beneficio de un juicio plenario, las controversias relacionadas a un documento intitulado "Proposal to Purchase", así como los acuerdos verbales entre las partes sobre la creación y responsabilidades de la corporación Extracciones Sin Límite, (ESL), los gastos incurridos para la obtención del permiso del DRNA y el plano de mensura.

Ahora bien, previo a discutir la prueba presentada y disposición del caso, resulta necesario (por ser atinente al segundo señalamiento de error) puntualizar el tracto procesal correspondiente a la etapa de descubrimiento de prueba.

Surge del expediente y de los autos originales que, el 23 de agosto de 2019, (con la autorización del TPI)[9] el demandante presentó una *Segunda Demanda Enmendada* en la que añadió una segunda causa de acción por daños y perjuicios en contra de HH. Reclamó los graves daños sufridos por la inacción e incumplimiento con el proceso de permisos necesarios para cumplir el proyecto pactado anteriormente. A pesar de oponerse a la enmienda en esta etapa de los procesos,[10] HH acreditó su *Contestación a Segunda Demanda Enmendada y Reconvención Enmendada*.[11] A esta última,

---

[7] Autos originales Tomo II págs. 286-287.
[8] Íd. a las págs. 277-282.
[9] Apéndice, págs. 98-105.
[10] Apéndice, pág. 106.
[11] Apéndice, págs. 148-153.

el demandante replicó el 31 de enero de 2020.[12] Pendiente lo anterior, las partes acreditaron varios informes con antelación al juicio.[13] Celebrada una primera conferencia, el TPI aprobó una enmienda al *Informe de conferencia con antelación al juicio* en la que el demandante anunció cierta evidencia relacionada con las cantidades de pagos realizados por el proceso de permiso de extracción ante el DRNA.

El dictamen fue objeto de revisión ante esta Curia (recurso número KLCE202000896) y un panel hermano denegó la expedición del auto de *certiorari* el 20 de noviembre de 2020.[14]

Tras varios incidentes procesales[15] y algunas posposiciones, el TPI celebró el juicio en su fondo.[16] Por la parte demandante, testificó Cautiño y Amparo Chaves, Planificadora Ambiental del DRNA. Por la parte demandada, testificó Ramos Fernández y Ramón Rey Cruz.[17] A continuación incluimos un resumen de los testimonios presentados.

<u>Genaro Cautiño Jordán</u>

El señor Cautiño Jordán testificó que firmó un contrato de compraventa, escrituras y un pagaré con HH para la venta de 50% de su finca y HH no cumplió el pago pactado. En la escritura de compraventa se le vendía a HH el 50% de toda la finca. Referente a la escritura de hipoteca y el pagaré, mencionó que nunca recibió el

---

[12] Apéndice, págs. 156-161.

[13] Apéndice, págs. 121-130. *Informe sobre la conferencia con antelación al juicio* el 11 de septiembre de 2019

[14] Autos originales, Tomo VI pág. 929. El Tribunal Supremo de Puerto Rico, denegó la expedición del auto de *Certiorari* (CC-2021-23) el 26 de febrero de 2021.

[15] Surge del expediente que el TPI atendió una Moción para reabrir el descubrimiento de prueba suscrita el 7 de diciembre de 2020 por HH, (ponchada el 11 de enero de 2021) por lo que dicha parte cursó un segundo interrogatorio y según la Minuta de la vista celebrada el 20 de enero de 2021 el TPI concedió otro término a la otra parte para contestar los interrogatorios cursados. Luego, el 19 de mayo de 2021 se celebró otra conferencia con antelación al juicio. Véase, Tomo VI autos originales, págs. 889-937.

[16] Los días 9, 11, 16, y el 18 de febrero de 2022, respectivamente, así como, el 13 de abril de 2022 y concluyó el 18 de mayo de 2022.

[17] Apéndice, págs. 274-290. Finalizado el juicio, el 3 de agosto de 2022 el demandante interpuso una *Moción de desestimación de reconvención* junto a una *Moción de Memorandum de Hechos y Derechos*. El demandado se opuso mediante escrito presentado el 22 de agosto de 2022 a la cual replicó el demandante y luego reaccionó la otra parte el 6 de septiembre de 2022.

dinero que se había pactado.[18] Declaró que las partes crearon la corporación Extracciones Sin Límites (ESL) y que la misma no tenía nada que ver con el cumplimiento del pagaré. Dicha corporación fue creada para desarrollar el proyecto y a esos fines, pagó los gastos relacionados al trámite de permisos ante el DRNA para la extracción de relleno. Cautiño atestiguó que habían acordado asumir los gastos en partes iguales.[19] Relató que esa corporación se quedó sin fondos porque a su entender "todo el dinero se lo había llevao´ Benito".[20] Para poder costear múltiples gastos referentes a los permisos, utilizó su propio dinero y gestionó el permiso bajo su nombre. Su primera solicitud fue denegada, pero luego el DRNA le otorgó el permiso de extracción el 12 de mayo de 2017.[21]

Durante el contrainterrogatorio explicó que la venta propuesta corresponde al 50% de la finca. Clarificó que, en el plano de mensura se menciona un área de extracción propuesta para ubicar la primera extracción. Aceptó que no está escrito en ningún documento que esa área corresponde a la primera fase del proyecto. Manifestó que tan pronto se hizo la mensura se la entregó a HH, pero no sabe precisar la fecha cierta de dicha entrega. Expuso que no reconoce la carta dirigida a Ramos Fernández del 19 de octubre de 2012 y que no está firmada por él. Aceptó que para esa fecha aún no había obtenido el permiso final del DRNA.[22]

Testificó que no transfirió el inmueble a ESL porque el "Proposal to Purchase" (PTP) se había eliminado por completo.[23] Referente al permiso radicado ante el DRNA, el mismo fue radicado a nombre de Genaro Cautiño y no de ESL ya que se había comenzado todo el proceso con su nombre.[24] Declaró que él ha

---

[18] Transcripción de la prueba oral, págs. 13-35.
[19] TPO, págs. 47-139.
[20] TPO, pág. 49.
[21] TPO, págs. 385-390.
[22] TPO, págs. 166-177.
[23] TPO, pág. 184-188.
[24] TPO, pág. 214, líneas 2-15.

puesto todo el dinero para la obtención del permiso en los últimos siete u ocho años.[25] Cautiño manifestó que el documento titulado "Draft Proposal to Purchase" no tiene nada que ver con la compraventa ya que ese acuerdo había sido eliminado por la escritura y así consta en ella. Al concluir su testimonio informó sobre el proceso y los pagos realizados a terceros por trabajos realizados para conseguir el permiso del DRNA. Además, informó sobre los depósitos en la cuenta de ESL y las escrituras y el pagaré, así como la falta de pago por parte del demandado.[26]

### Amparo Chávez Girona

La señora Amparo Chávez Girona, Planificadora Ambiental del DRNA testificó que trabaja en la división de corteza terrestre y que, aunque ella no trabajó el permiso solicitado por Cautiño, lo pudo acceder a través del sistema. Narró que el expediente con el número de caso O-CT-PFE01-SJ-00153-2710-2008 está a nombre de Cautiño.[27] Declaró que, si el apelante no hubiera cumplido con lo exigido por el DRNA, todavía no hubiera salido el permiso.[28] Testificó que se puede solicitar cambiar el nombre del solicitante del permiso mediante una propuesta al DRNA.[29] Por último, explicó que sin permiso no se puede extraer el terreno.[30]

### Benito Ramos Fernández

El señor Ramos Fernández testificó sobre el "Proposal To Purchase", refiriéndose a este, como el documento original que firmaron Cautiño y él, para la compra de una parte de la finca que le pertenecía a Cautiño, la cual pretendían explotar en forma de una cantera.[31] Manifestó que en ese documento las partes se obligaron a crear ESL, como una corporación doméstica bajo los términos y

---

[25] TPO, pág. 283, líneas 1-3.
[26] TPO págs. 196- 331.
[27] TPO, pág. 359, líneas 25-27.
[28] TPO, pág. 362, líneas 1 y 2.
[29] TPO, pág. 364, líneas 7-24.
[30] TPO, pág. 371, línea 5.
[31] TPO pág. 513, líneas 2-19.

condiciones que se establecieron en el PTP. Declaró que fue Ramón Rey quien incorporó la misma a petición de Cautiño y él, pues era su amigo y contable.[32] Explicó que él es dueño de HH, el cual se dedica a inversiones en Puerto Rico. Informó que HH se comprometió a comprar el 50% de la finca en la Escritura de Compraventa y adelantó a Cautiño doscientos mil dólares. Haciendo referencia a la Escritura de Compraventa, explicó que las partes se comprometieron a efectuar la mensura del inmueble y a ajustar el precio de venta, según correspondiese, a razón de $32,500.00 la cuerda. Acordaron, además, que el comprador se obligaba a otorgar un nuevo pagaré hipotecario gravando su participación por el balance adeudado que resultara de la mensura, al término de sesenta (60) días de esta haberse efectuado.[33] Recibió de parte de Cautiño dos documentos emitidos por el DRNA, (marcados como "exhibit" C y D) en una fecha contemporánea al 28 de septiembre de 2012. Explicó que el sumario se refiere a los depósitos (exhibit F) que se realizaron por parte de ambos a ESL. Indicó que él depositó un total de $34,200.00 y Cautiño depositó $13,560.00, para un total de $47,760.00 en la cuenta de ESL.[34] Manifestó que vio por primera vez tanto la Resolución emitida por el DRNA como el plano de mensura durante el proceso de descubrimiento de prueba. Añadió que el plano de mensura tiene fecha de 15 de septiembre de 2010. Entendió que, como el plano de mensura dice que el área de extracción propuesta es de 20.98 cuerdas y 2.2 cuerdas para almacenar, ese debe ser el área que se debe dividir por partes iguales entre ellos y multiplicar su parte por los $32,500.00 para hacer el segundo pagaré. Comentó que le pidió la mensura a Cautiño, pero

---

[32] TPO, págs. 515-517.
[33] TPO, págs. 526-527.
[34] TPO, págs.513-547.

nunca se le entregó la mensura porque esta reduciría el precio de la compraventa sustancialmente.[35]

A preguntas del tribunal sobre la Escritura de Compraventa, Ramos Fernández esbozó que, en la escritura dice que ambos se comprometen [a realizar la mensura], pero que él entendía que eso lo haría Cautiño ya que este tenía los ingenieros, pero admitió que ambos la pagarían.[36] Narró que Cautiño nunca le dijo que se había hecho la mensura. Explicó que la carta de 19 de octubre de 2012 es un error y una estafa porque Cautiño estaba tratando de cobrar lo que no es correcto, y por eso se rompió la relación. Ramos Fernández dijo que no quería hacer más contratos con [Cautiño] porque no había cumplido con la mensura y no había pagado la misma cantidad por los gastos incurridos. Ramos Fernández explicó que estaba de acuerdo con pagar $32,500.00 la cuerda del área que sería utilizada para la cantera.[37]

Ramos Fernández admitió que en la Escritura de Compraventa se estableció que, al firmarla, el PTP no tendría valor.[38] Como parte del contrainterrogatorio Ramos Fernández indicó que HH no firmó un documento para traspasar la finca a ESL.[39] Admitió que en la corporación compareció en su capacidad personal.[40] Explicó que no contestó la carta enviada por Cautiño [octubre de 2012] porque no había nada que contestar, estaban rompiendo la relación.[41] Indicó que no había realizado ningún pago en cumplimiento del pagaré.[42]

---

[35] TPO, págs. 553-560.
[36] TPO, pág. 562, líneas 12-23.
[37] TPO, págs. 565-571.
[38] TPO, pág. 575, línea 13.
[39] TPO, pág. 583 líneas 9-16.
[40] TPO, pág. 586
[41] TPO, pág. 602, líneas 12-18.
[42] TPO, pág. 615, línea 16.

Ramón Rey Cruz

El señor Ramón Rey Cruz testificó que es contable y especialista en planillas, pero aclaró que no es CPA.[43] Testificó que conoce a Ramos Fernández desde hace veinte (20) a veinticinco (25) años. Declaró que incorporó y trabajó para la corporación ESL, y que manejaba la cuenta bancaria. Atestó que conoce a Cautiño hace diez (10) años por conducto de Fernández.[44] Explicó que era el encargado de contabilizar todas las aportaciones a ESL, las cuales Cautiño hizo mediante cheques, nunca en efectivo. Informó que preparó el "exhibit" F, el cual recoge todas las aportaciones de cada uno de los inversionistas.[45] Relató que nunca se le entregó un plano de mensura.[46] Declaró que para poder emitir cheques necesitaba la autorización de Cautiño y de Ramos Fernández y aseguró que al menos uno de ellos firmaba con él los cheques.[47] Por último, manifestó que emitió un cheque a favor de Ramos Fernández sin consultarlo con Cautiño debido a que había diferencias entre los señores y la aportación de Ramos Fernández había sido mayor que la de Cautiño[48].

Evaluada la prueba testifical y documental, el TPI emitió la *Sentencia* recurrida el 20 de abril de 2023, notificada el 9 de mayo de 2023, la cual fue enmendada *Nunc Pro Tunc* el 7 de noviembre de 2023. En esta, declaró ha lugar la demanda y denegó la segunda causa de acción del demandante sobre daños y perjuicios e impuso el pago de honorarios de abogado. En su consecuencia ordenó la venta en pública subasta del inmueble hipotecado para garantizar el pago de la referida deuda. Además, ordenó al demandante pagar ciertos créditos a favor del demandado y declaró no ha lugar la reconvención.

---

[43] TPO, págs. 488-491.
[44] TPO, pág. 497, línea 1.
[45] TPO del 18 de mayo de 2022, págs. 640-643.
[46] TPO, pág. 646, líneas 12-20.
[47] TPO, pág. 660, líneas 9-16.
[48] TPO, pág. 674, líneas 4-22.

En atención a las controversias expuestas por el apelante en la reconvención y atinentes al recurso ante nos, a continuación, destacamos los siguientes pronunciamientos del TPI en las cuales se desprenden los hechos adjudicados, el análisis y disposición de la causa:

[...]

De la evidencia presentada se establece que el Sr. Cautiño y HH realizaron un contrato de compra y venta del 50% de la Finca 503, y que las intenciones eran para eventualmente desarrollar una compañía de extracción de terreno, para la venta. El proceso de compraventa se llevó a cabo y se dispuso que se estaría vendiendo el 50% de toda la finca (con excepción de la servidumbre), y que se pagaría $32,500 por cuerda. Existía un estimado del tamaño de la finca (72 cuerdas), por lo que se estableció en la Escritura de Compraventa que se estaría pagando inicialmente $645,000 al vendedor. De esta cantidad, se adelantaría el pago de $200,000 y los restantes $445,000 se estaría confeccionando una escritura hipotecando el 50 por ciento de la Finca 503, junto a un pagaré al portador, el que vencería el 31 de marzo de 2014. La Escritura de Compraventa establece que luego que las partes mesuraran nuevamente la finca se ajustaría la medida del terreno, se calcularía la mitad del mismo y se multiplicaría por el precio por cuerda establecido, lo que resultaría en el precio correspondiente a la mitad de la finca. Habiendo realizado la mensura, la parte demandada tendría 60 días para efectuar una nueva hipoteca que incluyera la cantidad total adeudada con los términos establecidos en la primera hipoteca. La Escritura de Compraventa también se establecía que una vez se obtuviera los permisos de extracción, al próximo mes, se estaría cobrando los intereses establecidos en la Hipoteca.

La Escritura de Compraventa, la Escritura de Hipoteca y su Pagaré, fueron bien constituidos y cumplen con todos los requisitos en ley para su validez. Ninguna de las partes cuestionó este hecho.

[...]

Dejándonos llevar por los testimonios de los testigos y la evidencia presentada, llegamos a la conclusión de que no procede en derecho lo solicitado por el demandado.

Para empezar, lo informado por la parte demandante al Sr. Fernández, en su carácter personal, (antes de que se hiciera la compraventa con HH) fue que tenía personas interesadas en la compra del terreno que se extrajera. Por sí solo, esta reclamación no sería suficiente para dejar sin efecto la compraventa y la ejecución de la hipoteca, tampoco se estableció como condición.

Por otro lado, en cuanto a que el Sr. Cautiño no aportó la mitad de los gastos para la obtención de los permisos de extracción, tiene razón. De la evidencia presentada se desprende que, durante el proceso de obtención de los p[e]rmisos de extracción de terreno, el Sr. Cautiño aportó $12,140.00 menos que el Sr. Fernández. Este incumplimiento no es suficiente para la Resolución de las Escrituras y del Pagaré. De estos documentos no se desprende como condición la aportación del 50% de los gastos incurridos para el desarrollo e implementación de ESL.

En lo relacionado al largo tiempo que se tardó Cautiño en la obtención de permiso de extracción, de la evidencia presentada y creída, se desprende que no existe un término establecido para la obtención del permiso. Por otro lado, la tardanza no se debió a que la parte demandante se cruzara de brazos, por el contrario, se evidenció todas las gestiones realizadas: pagos de póliza de seguro, cumplimiento de requisitos, cartas de DRNA dando por cumplido

los requisitos, contratación de profesionales para revertir la denegación, y finalmente la obtención del permiso.

En cuanto a que no le fue notificada el plano de mensura (alegadamente por que al Sr. Cautiño no le convenía los resultados, ya que la mensura era menor), ni la obtención de permiso de extracción, no lo creemos así. La prueba presentada establece que la responsabilidad de la mensura no era solo del demandante, sino que ambas partes tenían la responsabilidad de llevar a cabo la mensura. De tomarse por cierto que no se le notificó el nuevo plano de mensura en el 2010, la carta del 2012 (informando el comienzo del pago de intereses y adelanto del principal), se le informó a la parte demandada que ya se había realizado el plano de mensura. Era responsabilidad de ambas partes la realización del plano de mensura, por lo que mínimo, la parte demandada debió solicitar copia del plano, si como alega, no se la había provisto.

Por otro, del testimonio del Sr. Fernández, se establece que desde octubre o noviembre de 2012, ya la relación contractual estaba afectada, y que el rompimiento del contrato era inquebrantable. Además, informó que, para ese entonces perdió comunicación con el demandante. Lo que demuestra es que no había una intención de continuar con el cumplimiento del contrato tal y como se estableció, por lo que poco valdría cualquier esfuerzo de comunicación por parte del demandante para continuar con el negocio.

En lo relacionado al hecho de que el demandante no incluyó a ESL en la solicitud de permiso al DRNA, lo que abona a la solicitud de Resolución en la Escritura de Compraventa y de la Resolución del negocio de extracción, no estamos de acuerdo con el demandado. El demandante declaró que antes de hacer negocio con HH, ya había comenzado a realizar las gestiones de obtener permiso de extracción con DRNA, y que cambiar de nombre del solicitante conllevaría comenzar nuevamente con el proceso, lo que hubiera provocado un atraso adicional en la obtención de los permisos. Además, en nada se afectaría la extracción del terreno por la corporación una vez obtenido el permiso de extracción en esa Finca. En adición, este requisito no fue incluido en el contrato vigente (Escritura 1), por lo que la subsistencia de las Escrituras y del Pagaré no dependen de esta condición.

En lo relacionado a que el demandante nunca traspasó a nombre de ESL la Finca 503, esto no se había realizado y no se podía realizar, hasta que HH hubiera cumplido con lo establecido en el contrato de compraventa y que hubiera realizado la nueva hipoteca que incluiría el total adeudado al demandante, cosa que no se logró por causa del demandado. Este requisito tampoco fue incluido en las Escrituras o en el Pagaré.

Para finalizar, la parte demandada solicita la resolución del contrato y de sus obligaciones, por ser la mensura del terreno vendido en el contrato mucho menor. Lo que alega la parte demandada es que la hipoteca no procedería, ya que el precio de la finca que se utilizaría para la extracción de terreno, que es lo único que se comprometió a comprar, sería menor a la hipoteca realizada. Según lo establecido en el lenguaje de la Escritura de Compraventa, no le asiste la razón. El lenguaje es claro y no está sujeto a interpretación, se vende la mitad de la totalidad de la finca, y lo único que no se tomará en consideración al momento de establecer el tamaño para el precio, será la servidumbre del terreno. Por tanto, tampoco procede esta reclamación.

Entendemos que la parte demandada fue el único responsable del incumplimiento del contrato de compraventa. Su determinación a finales del 2012, de no continuar con el negocio jurídico provocó que no se finalizara el mismo.

[...]

Inconforme, HH acude ante nos y le imputa la comisión de los siguientes errores al foro primario:

Existe error manifiesto del Tribunal de Instancia en la apreciación de la prueba al encontrarse probados todos los elementos necesarios para resolver el contrato que nos ocupa, abandonando el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida.

El Tribunal de Instancia mostró prejuicio y parcialidad en el trámite y la Sentencia en por lo menos al permitir que se enmendara la Demanda luego de transcurrido el período para descubrir prueba en perjuicio del aquí compareciente al permitir prueba que no fue descubierta oportunamente, inclusive prueba de daño de una causa de acción que estaba prescrita de su faz y al darle credibilidad al testimonio evasivo e incoherente que fue impugnado por uno de sus testigos, al igual que por el Sr. Ramón Rey.

El 27 de junio de 2023, la parte apelada presentó *Alegato del Apelado.* Arguyó que el TPI no cometió los errores señalados por HH y a su entender, la controversia por la cual acuden ante este Tribunal constituye cosa juzgada por haber sido ya atendido por un panel hermano de este Tribunal. Además, alegó que la credibilidad de los testigos que declararon en el foro primario no constituyó prejuicio o parcialidad y que el TPI le otorgó credibilidad, según la prueba presentada. Por lo anterior, solicitó que se declare sin lugar el presente recurso.

Por su parte, el 22 de septiembre de 2023, HH presentó un *Alegato Suplementario* en el cual reiteró que existe prueba incontrovertible del incumplimiento de Cautiño que justifica la resolución del contrato entre las partes. Además, reafirmó su postura respecto a que el TPI incurrió en prejuicio y parcialidad al otorgarle credibilidad a los testigos cuando estos fueron realizados de manera mendaz y mediando parcialidad.

Conforme nos autoriza la Regla 83.1 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XII-B, R. 83.1, emitimos una *Resolución* en la que ordenamos al foro primario fundamentar su dictamen, con particular atención a la reconvención. En cumplimiento con lo anterior, el Juez Harry E. Rodríguez Guevara presentó la antes citada *Sentencia Enmendada Nunc Pro Tunc,* el 7 de noviembre de 2023. Acto seguido, concedimos un término a

ambas partes para reaccionar al referido pronunciamiento. Con el beneficio de sus posturas, la transcripción y los autos originales, procedemos a resolver.

**II.**

**A. Derecho Contractual**

En nuestra jurisdicción rige el principio de la autonomía contractual y *pacta sunt servanda*. Las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y el orden público. Art. 1210 del Código Civil de Puerto Rico de 1930,[49] 31 LPRA sec. 3375; *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 182 (2018). Los contratos tienen fuerza de ley entre las partes contrayentes, quienes vienen obligadas a observar sus términos. Art. 1044 del Código Civil, *supra*, sec. 2994.

Los contratos en Puerto Rico se perfeccionan por el mero consentimiento, y desde ese momento, las partes se obligan al cumplimiento de lo expresamente pactado y a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, *supra*. Véase, además, *Betancourt González v. Pastrana Santiago*, supra. Un contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o a prestar algún servicio. Art. 1206 del Código Civil de Puerto Rico, *supra*, sec. 3371; *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 726-727 (2018). Además, el Art. 1028 del Código Civil de Puerto Rico, *supra*, sec. 3373, establece que "la validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes". El Tribunal Supremo de Puerto Rico ha expresado que en las obligaciones contractuales la ley primaria es la voluntad de las

---

[49] Hacemos referencia al Código Civil de Puerto Rico de 1930, hoy derogado, pues los hechos del caso ante nuestra consideración ocurrieron con anterioridad a la vigencia del Código Civil de Puerto Rico de 2020.

partes y los tribunales no pueden relevar a una parte de cumplir con lo pactado cuando es legítimo y no contiene vicio alguno. *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999). De manera que, no debe relevarse a las partes de lo expresado y válidamente pactado, siempre que "dicho contrato sea legal y válido y no contenga vicio alguno". *Olazábal v. US Fidelity, Etc.*, 103 DPR 448 (1975).

Cuando los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 LPRA sec. 3471; *Marcial v. Tomé*, 144 DPR 522, 536 (1997). De lo contrario, las cláusulas del contrato deben leerse de forma integrada e interpretarse las unas con las otras, resolviendo cualquier ambigüedad de modo que todas sus partes surtan efecto. Art. 1236 y 1237 del Código Civil, 31 LPRA sec. 3474 y 3475. Es decir, los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 387 (2009).

El derecho de reclamar la resolución de obligaciones recíprocas emana del artículo 1077 del derogado Código Civil de 1930, 31 LPRA sec. 3052. La referida disposición establece, en lo pertinente, lo siguiente:

> La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe. El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible. El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo. [...]

31 LPRA sec. 3052.

En su interpretación de esta disposición, el Tribunal Supremo ha expresado que, en cuanto a la resolución del contrato, se establece una condición resolutoria tácita en todo contrato bilateral, la cual opera *ex proprio vigore*. *Álvarez v. Rivera*, 165 DPR 1, 19 (2005). Es decir, que, si uno de los contratantes incumple, el otro puede dar por resuelto el contrato, sin necesidad de que un tribunal así lo declare. *Íd.*

Si quien incurre en incumplimiento, exige la satisfacción de la prestación que se le debe, la otra parte puede imponer la defensa del contrato incumplido. *Íd.*, a la pág. 20; *Mora Dev. Corp. v. Sandín*, 118 DPR 733, 742 (1987). A este principio general en materia de contratos recíprocos, se le conoce como *exceptio non adimpleti contractus*. *Álvarez v. Rivera*, supra, a la pág. 20. Esta, se fundamenta en la regla de la ejecución simultánea de las obligaciones recíprocas. *Íd*; Artículo 1053 del derogado Código Civil de 1930, 31 LPRA sec. 3017.

### B. Apreciación de la Prueba

El Tribunal Supremo de Puerto Rico estableció que "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013).

Como regla general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, sin intervenir con la apreciación y la adjudicación de credibilidad que realiza el juzgador de los hechos en relación con la prueba testifical. *Pueblo v. Hernández Doble*, 210 DPR 850, 864-865 (2022); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Sin embargo,

esta regla cede si se demuestra que, el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto. *Ortiz Ortiz v. Medtronic,* supra.

Como se sabe, es doctrina reiterada por el Tribunal Supremo de Puerto Rico que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Arlequín Vélez*, 204 DPR 117, 147 (2020). A esos efectos, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres,* 117 DPR 645 (1986).

Con tales fines, y en la medida en que el juzgador de los hechos no está exento de equivocaciones, dicha parte habrá de presentar y reproducir la transcripción de la prueba oral. *Pueblo v. Pérez Delgado*, 211 DPR 654, 672 (2023). La ausencia de la transcripción imposibilita que responsablemente los foros revisores puedan descartar la apreciación razonada y fundamentada de la prueba que realizó el juzgador de los hechos. *Íd.*

Por otro lado, la Regla 110 (a) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110(a), dispone que "el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes". A su vez, en los casos civiles, la Regla 110(f) de las Reglas de Evidencia, 32 LPRA Ap. VI, R.110(f), establece que "la decisión de la juzgadora o del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad, a menos que exista disposición al contrario". Cónsono con lo anterior, el Tribunal Supremo ha resuelto que, [d]e ordinario, el *quantum* de prueba necesario para prevalecer en el ámbito administrativo es el

de preponderancia de la prueba". *OEG v. Martínez Giraud*, 210 DPR 79, 93 (2022).

### C. Enmienda a la Demanda

La Regla 13 de las de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 13, regula las enmiendas a las alegaciones. Conforme a la Regla 13.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 13.1, una parte puede enmendar sus alegaciones bajo las siguientes circunstancias:

> [c]ualquier parte podrá enmendar sus alegaciones en cualquier momento antes de habérsele notificado una alegación responsiva, o si su alegación es de las que no admiten alegación responsiva y el pleito no ha sido señalado para juicio, podrá de igual modo enmendarla en cualquier fecha dentro de los veinte (20) días de haber notificado su alegación. En cualquier otro caso, las partes podrán enmendar su alegación únicamente con el permiso del tribunal o mediante el consentimiento por escrito de la parte contraria; y el permiso se concederá liberalmente cuando la justicia así lo requiera. La solicitud de autorización para enmendar las alegaciones deberá estar acompañada de la alegación enmendada en su totalidad. Una parte notificará su contestación a una alegación enmendada dentro del tiempo que le reste para contestar la alegación original o dentro de veinte (20) días de haberle sido notificada la alegación enmendada, cualquiera de estos plazos que sea más largo, a menos que el tribunal de otro modo lo ordene.

Sobre este tema, el Tribunal Supremo de Puerto Rico dispuso en *Dist. Unidos de Gas v. Sucn. Declet Jiménez*, 196 DPR 96, 117 (2016), que las enmiendas pueden ampliar las causas de acción de la demanda original e incluso, pueden añadir una o más causas de acción, las cuales se retrotraerán a la fecha de presentación de la demanda original siempre y cuando surjan de la misma conducta, acto, omisión o evento expuesto en la alegación original.

En *León Torres v. Rivera Lebrón*, 204 DPR 20 (2020), el Tribunal Supremo dictaminó que las enmiendas a las alegaciones deberán concederse liberalmente cuando la justicia lo requiera. De igual manera, resolvió que, el mero transcurso del tiempo no es suficiente para impedir la enmienda solicitada. *Íd.* En virtud de lo anterior, el Tribunal Supremo expresó haber avalado enmiendas a

las alegaciones en procedimientos judiciales en etapas avanzadas. *Íd.* Sobre este tema y citando al tratadista José A. Cuevas Segarra, el Tribunal Supremo estableció que, los cambios en la teoría original y la adición de nuevas reclamaciones no debe ser un obstáculo para denegar una solicitud de enmienda a las alegaciones. J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. 2, pág. 594. Ello, en virtud de la política pública de que las controversias se resuelvan en los méritos y que todo litigante tenga su día en corte. *León Torres v. Rivera Lebrón*, supra.

Sin embargo, nuestro más Alto Foro destacó que el Tribunal de Primera Instancia habrá de tomar en consideración los siguientes criterios previo a conceder solicitudes de enmiendas a las alegaciones: (1) el momento en que se solicita; (2) el impacto que tendría en la pronta adjudicación de la controversia; (3) la razón atribuible a dicha demora; (4) el perjuicio que causaría a la otra parte; y (5) los méritos intrínsecos de la defensa que tardíamente se plantea. *León Torres v. Rivera Lebrón*, supra. Sobre tales criterios, nuestro más Alto Foro aclaró que, el factor predominante ha de ser el perjuicio que dicha enmienda puede causarle a la parte contraria. *Íd.*

### D. El descubrimiento de prueba y el manejo del caso ante el Tribunal de Primera Instancia

El funcionamiento efectivo de nuestro sistema judicial y la pronta disposición de los asuntos litigiosos hacen necesario que los jueces de instancia ostenten gran flexibilidad y discreción para lidiar diariamente con el manejo y la tramitación de los asuntos judiciales. *Banco Popular de Puerto Rico v. Gómez Alayón y otros,* 2023 TSPR 145, resuelto el 19 de diciembre de 2023. Es por ello que, a éstos se les ha reconocido poder y autoridad suficiente para conducir los asuntos litigiosos ante su consideración y para aplicar correctivos apropiados en la forma y manera que su buen juicio les indique. *In*

*re Collazo I,* 159 DPR 141, 150 (2003). El Tribunal de Primera Instancia tiene el deber ineludible de garantizar que los procedimientos se ventilen sin demora, con miras a que se logre una justicia rápida y eficiente. *In re Pagani Padró,* 181 DPR 517, 529 (2011).

Como regla general, los foros revisores no intervendrán con el manejo del caso ante la consideración del TPI. *Citibank et al. v. ACBI et al.,* 200 DPR 724, 736 (2018). Siendo así, el Tribunal Supremo ha manifestado que los tribunales apelativos no deben intervenir con determinaciones emitidas por el foro primario y sustituir el criterio utilizado por dicho foro en el ejercicio de su discreción, salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso de discreción, o que incurrió en error manifiesto. *Íd.* El ejercicio adecuado de la discreción se relaciona de manera estrecha con el concepto de razonabilidad. *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).

De otra parte, el descubrimiento de prueba en nuestra jurisdicción está regulado por la Regla 23 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 23. El descubrimiento de prueba coloca a las partes y al tribunal en posición de: (1) precisar los asuntos en controversia; (2) obtener evidencia para ser utilizada en el juicio; (3) evitar sorpresas en esta etapa de los procedimientos; (4) facilitar la búsqueda de la verdad y; (5) perpetuar la evidencia. *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc. y otros,* 2023 TSPR 65, resuelto el 8 de mayo de 2023. Es por ello, que, nuestro ordenamiento jurídico favorece una etapa de descubrimiento de prueba amplia y adecuada con el fin de evitar inconvenientes, sorpresas e injusticias por ignorancia de las cuestiones y los hechos realmente en litigio. *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR 716, 730 (1994). Como se sabe, el alcance del descubrimiento de prueba se limita a materia pertinente

y no privilegiada. Regla 23.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 23.1; *McNeil Healthcare v. Mun. Las Piedras I*, 206 DPR 391, 406 (2021). La prueba pertinente que puede ser objeto de descubrimiento es aquella donde existe "una posibilidad razonable de relación con el asunto en controversia". *Medina v. M.S. &D. Química P.R., Inc.*, supra, pág. 731.

Cabe señalar que, el descubrimiento de prueba, a pesar de ser amplio y liberal, los foros de instancia gozan de una amplia discreción para regularlo, de manera que, se garantice una solución justa, rápida y económica. *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc. y otros*, supra. A esos efectos, la Regla 37.3 de Procedimiento Civil, *supra*, faculta al foro primario a imponer sanciones económicas ante el incumplimiento de una parte con una orden de calendarización del TPI relacionada al descubrimiento de prueba, en ausencia de justa causa. *Íd.* De igual manera, el TPI podrá imponer sanciones más drásticas "luego de que se aperciba a la parte sobre las consecuencias del incumplimiento y se conceda un tiempo razonable para corregir la situación." *Íd.* (Énfasis omitido.)[50]

### E. La prescripción extintiva

La prescripción extintiva es un modo de extinguir el derecho a ejercer determinada causa de acción. *SLG Haedo-López v. SLG Roldán-Rodríguez*, 203 DPR 324, 336 (2019). Su propósito es "castigar la inercia y estimular el ejercicio rápido de las acciones". *Íd.* El Art. 1830 del Código Civil de Puerto Rico, 31 LPRA sec. 5241, establece que los derechos y las acciones se extinguen por medio de la prescripción. *Santos de García v. Banco Popular*, 172 DPR 759, 766 (2007). A esos efectos, el Art. 1861 del Código Civil de Puerto Rico, 31 LPRA sec. 5291, dispone que "[l]as acciones prescriben por

---

[50] Citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da ed., Estados Unidos, Publicaciones JTS, 2011, Tomo III, págs. 1118-1119.

el mero lapso del tiempo fijado por la ley". *Conde Cruz v. Resto Rodríguez,* 205 DPR 1043, 1067 (2020). El propósito de la figura de la prescripción extintiva es ponerles certidumbre a las relaciones jurídicas y castigar la inacción de quien no ejerce sus derechos de manera oportuna. *Íd.*

Los términos prescriptivos varían según el tipo de derecho o acción. En lo pertinente al caso de autos, las acciones personales que no tienen términos especiales de prescripción señalados prescriben a los 15 años. Art. 1864 del Código Civil de Puerto Rico, 31 LPRA sec. 5294; *Xerox Corp. v. Gómez Rodríguez y otros*, 201 DPR 945, 953 (2018). Por otro lado, el Código Civil de Puerto Rico establece que las acciones de responsabilidad civil extracontractual prescriben por el transcurso de 1 año. Véase Art. 1868 del Código Civil de Puerto Rico, 31 LPRA sec. 5298.

Al examinar cuál término prescriptivo es aplicable a un caso, el Tribunal Supremo de Puerto Rico ha expresado que ello requiere analizar los hechos según fueron alegados en la demanda. *Ramos v. Orientalist Rattan Furnt., Inc.*, 130 DPR 712, 717 (1992). El Tribunal Supremo de Puerto Rico adoptó la doctrina de *concurrencia de acciones* en *Ramos v. Orientalist Rattan Furnt, Inc.* supra, págs. 725-728, que le permite a la perjudicada optar entre la acción extracontractual o contractual en determinadas circunstancias. Para ello, el hecho causante del daño debe constituir, de manera simultánea, un incumplimiento de una obligación contractual y una violación al deber general de no causar daño a otro. *Íd.*, pág. 728. Ante la concurrencia de acciones, el Tribunal no puede concluir que se trata de una sola causa de acción extracontractual y aplicar el término prescriptivo de 1 año establecido en el Art. 1868 del Código Civil de Puerto Rico, *supra. Íd.*, págs. 729-730.

**III.**

En su primer señalamiento de error, el apelante nos plantea, que incidió el foro primario en la apreciación de la prueba al encontrarse probados todos los elementos necesarios para resolver el contrato constituido por Cautiño y HH. En específico, alega que la prueba refleja que el apelado incumplió lo pactado y procede resolver el contrato, cónsono con lo solicitado en la *Reconvención.* En síntesis, para fundamentar su argumento, resalta el alegado incumplimiento de Cautiño con el pago del 50% de los gastos para la obtención de los permisos de extracción, su presunta falta o tardanza en la entrega de un plano de mensura y el efecto de dicho plano sobre la cabida del área de extracción. Además, señaló su postura sobre la fecha de vencimiento del pagaré y el hecho de que no se sustituyó el nombre de Cautiño por ESL en la solicitud ante el DRNA. Además, por no transferir la porción de terreno a ESL, según el "Proposal to Purchase" (PTP) firmado el 11 de febrero de 2009.

Para una mejor comprensión de lo planteado, resulta necesario examinar los acuerdos pactados, así como las obligaciones de cada parte para luego determinar si -según la apreciación de la prueba- hubo algún incumplimiento señalado por el apelante que obligue la resolución del contrato en controversia. Adelantamos que, el referido error señalado no se cometió. Nos explicamos.

En primer lugar, al evaluar la totalidad del expediente con el beneficio de los autos originales y la transcripción de la prueba oral, colegimos que el foro primario actuó correctamente al sostener -desde una etapa temprana en el litigio- que la Escritura de Compraventa, la Escritura de Hipoteca y su Pagaré fueron bien constituidos ya que cumplen con todos los requisitos en ley para su validez y resultan vinculantes entre las partes. A esos efectos, de una lectura del inciso duodécimo de la Escritura de Compraventa, surge claramente que, mediante dicho instrumento público, las

partes dejaron sin efecto un acuerdo previo intitulado "Proposal to Purchase" (PTP) firmado el 11 de febrero de 2009.[51] De hecho, surge de la transcripción de la prueba oral que, ambas partes lo aceptaron así. Por ello, el TPI no incidió al limitar su análisis del caso y controversia a los acuerdos que se desprenden de la Escritura de Compraventa, la Escritura de Hipoteca y el Pagaré, así como lo pactado verbalmente sobre ESL. En su consecuencia, colegimos que el TPI no erró al concluir que el PTP no surte efectos ni resulta aplicable a este caso.

Superado lo anterior y dado que el PTP quedó sin efecto con la firma de la Escritura de Compraventa, resulta evidente que, los acuerdos entre las partes quedaron establecidos en dicha Escritura de Compraventa, así como en la Escritura de Hipoteca y el Pagaré. En estos instrumentos públicos surgen de forma explícita las obligaciones pactadas. A esos efectos, el TPI correctamente consignó, mediante la *Resolución* emitida el pasado 4 de diciembre de 2018 y luego en el referido dictamen impugnado, varios hechos medulares, a saber:

> El 2 de abril de 2009 la parte demandante vendió el 50% de una propiedad a la parte demandada.
> Con relación a la misma se otorgó escritura de compra y venta, escritura de constitución de hipoteca para garantizar un pagaré por $454,000.00 dólares y se otorgó dicho pagaré hipotecario.
>
> Para evidenciar la deuda hipotecaria se otorgó el pagaré, en el cual en su primera oración estable[ce] que el "valor: ($454,000.00) -vence 31 de marzo de 2014", y en su quinto párrafo indica que "el periodo de cinco (5) años mencionado en cuanto a los intereses comenzará el primer día del próximo mes en que se otorguen los permisos de extracción de relleno en la propiedad antes descrita".
>
> En ese momento vencerán un abono al principal por la cantidad de $50,000.00 y de esa fecha en adelante se pagarán intereses el primero de cada mes sobre el balance del principal adeudado, con el último pago al final de los cinco años del balance adeudado." Este pagaré en su primer párrafo, primera citación, indica: "Debo y pagaré solidariamente a Genaro Cautiño Jordán, portador o tenedor por endoso, o en su orden, de esta obligación, la suma de cuatrocientos cincuenta y cuatro mil dólares ($454,000.00)." Este pagaré es firmado por Benito R. Fernández como socio

---

[51] Véase, Exhibit 1 por Estipulación a la pág. 10.

gestor y en representación de Hoteles Horizonte, así lo declaró el notario público.

El 12 de mayo de 2017, el Departamento de Recursos Naturales y Ambientales emitió Resolución y Permiso para la extracción de materiales de la corteza terrestre de la finca 503, inscrita en el Registro de la Propiedad de Guayama, solicitado por el demandante.

"[...]Se desprende del propio pagaré, en su principio, que el 31 de marzo de 2014 es la fecha en que vence. En cuanto a lo establecido en el último párrafo del pagaré, a pesar de que no deja sin efecto el término en que vence, (31 de marzo de 2014), en cuanto a los intereses, se estableció en el mismo que comenzara a cobrarse el primer día del próximo mes en que se otorguen los permisos de extracción de relleno en la propiedad antes descrita. El permiso de extracción del Departamento de Recursos Naturales (DRNA) se otorgó el 12 de mayo de 2017, por lo que los intereses comenzarían a transcurrir desde el 1ro de junio de 2017, lo que es una fecha posterior al vencimiento del pagaré.

De ahí colegimos que, conforme a su apreciación de la prueba, el TPI correctamente determinó que, no se desprende condición alguna para honrar el pago de lo establecido en el pagaré. De la Escritura de Compraventa surge la obligación del comprador, Ramos Fernández, para adquirir la finca por el precio de $645,000.00. Se dispuso que el vendedor recibió $57,500.00 con anterioridad al acto, recibió $100,000.00 el día de la firma, y un pagaré de $42,500.00 a vencer el 6 de mayo de 2009. Para pagar el precio diferido de $454,000.00, el vendedor recibió un pagaré hipotecario vencedero el 31 de marzo de 2014. En dicho documento, solo se hace referencia al permiso de extracción, a los únicos efectos de establecer que aplica el pago de intereses a partir del primer día del próximo mes en que se obtenga el referido permiso. En dicho documento no se establece de forma fehaciente ninguna obligación de pago relacionada a los gastos en el proceso de obtener el permiso de extracción como condición previa al cumplimiento específico de lo pactado en las escrituras y el pagaré.

Ahora bien y a pesar de que, la supuesta condición de pago para sufragar gastos, no surge de las escrituras ni del pagaré, -sí surge- de la prueba admitida y creída por el foro primario- que,

Cautiño y Ramos Fernández llegaron a un acuerdo verbal[52] en el cual acordaron crear una corporación independiente (ESL) para que asumiera las responsabilidades atinentes al proyecto de extracción. Evaluada la prueba ante sí, el foro primario determinó como hecho incontrovertible que, ambas partes aportarían dinero para sufragar gastos en igual proporción. El apelante arguye que la prueba irrefutable estableció que Cautiño aportó menos cantidad de dinero que él por lo que ello es razón suficiente para resolver el contrato.

Sobre este particular, el juzgador de los hechos consideró que, las escrituras y los acuerdos verbales son asuntos distinguibles. Conforme a la credibilidad atribuida a los testimonios presentados, el TPI correctamente concluyó que, aunque Cautiño aportó una cantidad menor a la mitad de los gastos (en ESL), para la obtención de los permisos de extracción, dicho incumplimiento a lo pactado verbalmente no es razón para resolver las escrituras y el pagaré, pues esa condición no se desprende de esos documentos. Además, mediante lo pactado verbalmente, tampoco se vinculó dicha obligación de pago con HH, quien es la entidad jurídica que suscribió las escrituras y el pagaré. Tampoco surge de la prueba creída por el foro primario que, se haya condicionado el cumplimiento específico del pagaré, (suscrito por HH en las escrituras), con lo pactado de forma verbal entre Cautiño y Ramos Fernández sobre la creación y operación de una entidad jurídica independiente (ESL).

Debemos destacar que, en su pronunciamiento, el TPI planteó que, Cautiño se ocupó de gestionar el permiso del DRNA pero no consignó igual cantidad de fondos en la corporación para cubrir los gastos. En su consecuencia, ordenó a dicha parte pagarle

---

[52] Nuestro ordenamiento jurídico no prohíbe que los contratos sean verbales, sin embargo, reconoce que, por su naturaleza, tienen mayores riesgos de crear malentendidos ante la posibilidad de que las partes nieguen o alteren lo pactado. *Méndez v. Morales,* 142 DPR 26 (1996).

ciertas cantidades por concepto de créditos a favor del aquí apelante, lo cual no fue objetado por Ramos Fernández.

Además, el foro primario determinó que, de lo pactado verbalmente entre las partes, sólo se cumplió con la incorporación de ESL. No se cumplió con la aportación económica en partes iguales y tampoco se traspasó la finca a ESL. Conforme a su análisis de la prueba, el TPI correctamente concluyó que la fecha de vencimiento del pagaré no estaba condicionada al traspaso de la finca a la corporación, ESL. Añádase a ello que, el señor Ramos Fernández aceptó que no había emitido pago alguno sobre el pagaré objeto de esta controversia.[53] El TPI consideró irrelevante el argumento del apelante en torno a que, Cautiño no incluyó el nombre de ESL en la solicitud del permiso de extracción ante el DRNA. Ello, porque Cautiño inició el proceso en la agencia bajo su propio nombre y logró que se otorgara el permiso de extracción lo cual benefició a ambas partes. Además, el foro primario correctamente determinó basado en el testimonio de la funcionaria del DRNA, Amparo Chávez, -no impugnado- que de todos modos la inclusión del nombre de ESL en el proceso de solicitud de permiso de extracción, conllevaría empezar de nuevo y, por consiguiente, se atrasaría el proceso administrativo innecesariamente.

Por todo lo antes, coincidimos con el foro primario en que, el cuadro fáctico antes descrito, no constituye incumplimiento de lo pactado en las escrituras y en el pagaré. En la alternativa, y de todas formas, como cuestión de derecho, el supuesto incumplimiento del acuerdo verbal (sobre el pago de gastos para la obtención de permisos, falta de traspaso de la propiedad y la sustitución de nombre en la solicitud de permisos a ESL), no justifica, ni obliga la resolución de la Escritura de Compraventa, la Escritura de Hipoteca y del Pagaré.

---

[53]TPO, 13 de abril de 2022, apéndice, a la pág. 615, línea 16.

De otra parte, el apelante arguye que, el TPI erró al concluir que la responsabilidad de preparar la mensura caía sobre ambas partes, ya que, Ramos Fernández reside en New York. Añade HH que, al Cautiño no entregarle el plano de mensura oportunamente, impidió que pudiera identificar el área utilizable en la finca. A su entender, dicha tardanza es razón suficiente para resolver el contrato.

Al analizar la prueba sobre el tema del plano de mensura, el foro primario evaluó lo establecido en las escrituras, la carta enviada en octubre de 2012 a Ramos Fernández y la prueba testifical. De la Escritura de Compraventa[54] se desprende que ambas partes se comprometieron a efectuar la mensura del inmueble y, según la prueba creída por el foro primario, fue Cautiño quien se ocupó de gestionar el referido plano. El TPI resolvió correctamente que, de ninguno de los tres documentos públicos se desprende un término especifico de cumplimiento para la preparación y entrega del plano de mensura. Además, el TPI puntualizó que, en torno a la teoría del apelante y supuesta razón por la cual Cautiño no le notificó el plano de mensura a Ramos Fernández fue porque la mensura describe una cabida menor de lo prometido, **"no lo creemos así."** Observamos que, de la transcripción de la prueba surge que, Cautiño negó reconocer la carta enviada en octubre de 2012 en la cual se hace referencia al plano de mensura. De otra parte, constatamos que, Ramos Fernández por un lado testificó que, se enteró por primera vez, sobre el plano de mensura, durante el descubrimiento y por otro lado explicó que, la relación se quebrantó en el 2012, coetáneo al tiempo que recibió la carta de Cautiño (de octubre de 2012) y mediante la cual se informa sobre el plano de mensura. De lo antes ciertamente reconocemos las aparentes inconsistencias en los testimonios sobre este tema. Sin embargo,

---

[54] Véase, apéndice, a la pág. 323, inciso undécimo.

colegimos que el TPI le restó importancia por entender que lo pactado en las escrituras y el pagaré no está sujeto a un término de entrega del plano de mensura como condición de cumplimiento de las escrituras y el pagaré, según argumentado por Ramos Fernández. El raciocinio expuesto encuentra apoyo en la prueba admitida y creída por el foro primario, sin que se haya demostrado arbitrariedad o error manifiesto en su análisis.

Sostiene el apelante que, el TPI concluyó erróneamente que se adeudan $483,483.75, ignorando que el terreno utilizable era de 23.2137 cuerdas, por lo que el pagaré debía reducirse a $177,222.62. Esta aseveración de HH no encuentra apoyo en la prueba creída y admitida por el juzgador de los hechos. Ninguna de las tres escrituras públicas establece que la transacción era para la compra del área únicamente utilizable para la extracción del terreno.

El apelante arguyó que, erró el TPI al concluir que el pagaré venció el 3 de marzo de 2014, cuando la Escritura y el Pagaré establecen que vencerá 5 años después de obtener los permisos de extracción. La Escritura de Hipoteca contiene copia fiel y exacta del pagaré y en la primera oración de este se establece que vence el 31 de marzo de 2014. De una lectura del documento resulta evidente que, lo relacionado al periodo de cinco (5) años que comienza a correr desde el otorgamiento de los permisos de extracción, es en referencia al periodo por el cual se cobrarán intereses sobre el balance del principal adeudado, luego de obtenidos dichos permisos. En la Escritura de Hipoteca se incluyó el texto literal del Pagaré en el quinto inciso. El mismo establece que los intereses comenzarán a devengarse el primer día del próximo mes en que se obtengan los permisos de extracción de relleno de la propiedad objeto de la compraventa.[55]

---

[55] Véase, apéndice, a la pág. 329, inciso cinco.

El TPI fue quien tuvo ante sí a los testigos por lo que, su determinación sobre la credibilidad y valor probatorio atribuido a sus respectivos testimonios merece nuestra deferencia. Apreció que los alegados incumplimientos de Cautiño no fundamentan la resolución del contrato, toda vez que no surge dicha interpretación de las escrituras y el pagaré. Tampoco surge de la prueba que, lo acordado verbalmente por Cautiño y Ramos Fernández (para la creación y funcionamiento de ESL) vincule las obligaciones asumidas por HH como el comprador y deudor en este caso. El pagaré se encuentra vencido desde el 31 de marzo de 2014, por lo que la deuda es líquida y exigible. De una revisión sosegada de la totalidad de la prueba colegimos que, el apelante no nos ha puesto en posición para revertir la deferencia que merece la apreciación de la prueba del TPI, que fundamenta las determinaciones de hecho y conclusiones de derecho que sostienen el dictamen apelado. El primer error no se cometió.

En su segundo señalamiento de error, el apelante alega que incidió el foro primario al permitir que se enmendara la demanda luego de transcurrido el término para descubrir prueba; al permitir la presentación de prueba que no fue descubierta oportunamente y que la causa se encontraba prescrita de su faz, mostrando así prejuicio y parcialidad. No le asiste la razón. Nos explicamos.

La demanda fue presentada el 1 de septiembre de 2017 por el señor Cautiño Jordán y a petición de parte, el TPI autorizó una primera enmienda a la demanda original el 5 de marzo de 2019. En su consecuencia, el recurrido presentó la *Demanda Enmendada* el 5 de abril de 2019.[56] Posteriormente, el 23 de agosto de 2019, Cautiño solicitó al Tribunal otra enmienda a la demanda, a los efectos de añadir una nueva causa de acción sobre daños y

---

[56] La autorización para enmendar la demanda original se otorgó a los efectos de añadir la determinación y resolución emitida por el TPI el 14 de diciembre de 2018.

perjuicios. De la minuta del 18 de septiembre de 2019 surge que, el TPI autorizó la enmienda y el 30 de septiembre de 2019, así lo hizo constar. Respecto a la alegación del apelante de que la referida enmienda a la demanda fue tardía, no le asiste la razón. Veamos.

La Regla 13 de las de Procedimiento Civil de 2009, *supra*, regula particularmente las enmiendas a las alegaciones. Esta dispone que una parte puede enmendar sus alegaciones antes de habérsele notificado una alegación responsiva, con el permiso del tribunal (cuando la justicia así lo requiera) o mediante el consentimiento por escrito de la parte contraria. Nuestro más Alto Foro ha establecido que, el mero transcurso del tiempo no es suficiente para impedir la enmienda solicitada.[57] Nuestra evaluación sosegada del expediente y los autos originales, nos lleva a concluir que la enmienda solicitada por Cautiño fue realizada conforme a derecho y no se encuentra fuera de los parámetros establecidos por la Regla 13 de Procedimiento Civil, *supra*. Añádase a ello que, surge de los autos originales que en esa etapa de los procesos el propio demandado solicitó reabrir el descubrimiento de prueba y el TPI permitió que se cursara un segundo interrogatorio.[58]

De otra parte, lo señalado por el apelante está relacionado con el manejo del caso en el TPI. Como se sabe, el alcance de nuestra autoridad, sobre los asuntos atinentes al manejo de casos, está expresamente delimitado por el ordenamiento civil vigente, por lo que no procede nuestra intervención sobre este particular. De conformidad a la normativa antes expuesta, no procede interferir con los tribunales de instancia en el ejercicio de sus facultades discrecionales, excepto en aquellas situaciones en que se demuestre que se haya actuado con prejuicio, parcialidad o incurrido en craso

---

[57] *León Torres v. Rivera Lebrón*, supra.
[58] Véase nota al calce número 15.

abuso de discreción o equivocación en la aplicación de las normas procesales o sustantivas.

De nuestro examen del expediente colegimos que, el foro primario no se apartó de los parámetros de su discreción en el manejo del caso y en particular en la etapa de descubrimiento de prueba, por lo que, concluimos que lo expuesto por HH, resulta insuficiente para derrotar la eficacia de los pronunciamientos judiciales interlocutorios y mucho menos revertir el dictamen apelado.

Finalmente, respecto al planteamiento del apelante sobre el término prescriptivo, resulta evidente que, la causa de epígrafe no constituye una acción en daños y perjuicios extracontractual, sino una acción por responsabilidad contractual. De manera que, según la normativa antes expuesta, el término prescriptivo aplicable a la causa de epígrafe es de quince años, el cual inició el 31 de marzo de 2014 (fecha del vencimiento del pagaré). De todas formas, el foro primario únicamente ordenó resarcimiento por los daños causados por incumplimiento contractual y denegó la segunda causa de acción instada por dinero dejado de percibir, entre otros alegados daños generales. El segundo error no se cometió.

**IV.**

Por los fundamentos expuestos, confirmamos la *Sentencia Enmendada Nunc Pro Tunc* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones